UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

       Plaintiff,

v.

ANTJUAN PIERRE JACKSON,

       Defendant.

_____/

Case no. 1:23-cr-35

Hon. Jane M. Beckering
United States District Judge

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

The defendant, Antjuan Pierre Jackson, through his attorney, Sean R. Tilton, Assistant Federal Public Defender, hereby respectfully moves this Honorable Court to suppress all evidence obtained during the search of Mr. Jackson's residence, as well as any evidence that is fruit of the poisonous tree, because the affidavit in support of the search warrant did not establish probable cause, and the good-faith *Leon* exception does not apply under the facts presented here.  Additionally, Mr. Jackson moves to suppress the evidence obtained through the warrantless search of his cell phone during the arrest.

**Relevant Facts**

On December 15, 2022, pursuant to a search warrant, officers searched XXXX W. Michigan Avenue, Apartment 10, Kalamazoo, Michigan.  The affidavit in support of the search warrant alleged that on November 26, 2022, officers from the Kalamazoo Department of Public Safety were dispatched to XXXX W. Michigan Avenue, Apartment

4, on the report of a suspected deceased person.  (Attachment 1, Affidavit, Page 2, A). Joshua Shook (hereinafter "Shook") reported that he found his roommate, S.W., dead in their apartment at XXXX W. Michigan Avenue, Apartment 4. (Attachment 1, Affidavit, Page 2, D). Shook last seen S.W. alive on November 24 inside the apartment.  (Attachment 1, Affidavit, Page 2, D).  Officers found S.W. on the floor of his bedroom. (Attachment 1, Affidavit, Page 2, A).  Approximately five feet from S.W., officers found a glass pipe and a glass liquor bottle with a capped syringe wedged into the neck of the bottle, which are often used to ingest narcotics.  (Attachment 1, Affidavit, Page 2, B). Within a pile of clothing near S.W., officers located a phone, which believed to belong to S.W. (Attachment 1, Affidavit, Page 2, C).  The phone was seized and searched. (Attachment 1, Affidavit, Page 2, E).  Forensic extraction recovered text messages between this phone and a phone number determined to be linked to defendant Antjuan Jackson. (Attachment 1, Affidavit, Page 2, E, F).

The outgoing messages on November 15, 2022, from the seized phone inquired about selling food stamps. (Attachment 1, Affidavit, Page 3, G).  The two parties proceeded to discuss selling $100 worth of food stamps for $50.  (Attachment 1, Affidavit, Page 3, G).). Even though no drugs or drug transaction was mentioned in the messages, the affiant claims that the conversion was about drug deal.

> Outgoing Message: Hey its shawn. Do u buy F Stamps. Just wondering.
>
> Incoming Message: Yea
>
> Incoming Message: What u got
>
> Outgoing Message: 100 for 50

Incoming message: Ok I got a 50 for you

Outgoing Message: Ok ill be there home in 10

Outgoing Message: U home

Incoming Message: Yea

(Attachment 1, Affidavit, Page 3, G).

Two days later, the following exchange took place.

Outgoing message: Hey u home. I got paid.

Incoming message: Whats good bro

Outgoing message: Was wanting to grab that card if u were finished w

Incoming message: Ok

Incoming message: Give me a sec ill text u

Outgoing message: Ok

Incoming message: U ready

Outgoing message:  I'll be there in a sec

Outgoing message: I knocked and waited idk. Im home again.

(Attachment 1, Affidavit, Page 3-4, G).

Three days later, on November 20, the following messages were exchanged:

Outgoing message: Can I stop down there?

Incoming message: Whatbu need

Outgoing message: I'm broke til payday or this unemployment hits my

Incoming message: Ok

(Attachment 1, Affidavit, Page 4, G).

The messages continued later that day:

> Outgoing message: Hey can I stop over
>
> Incoming message: How many nails u need
>
> Outgoing message: 20
>
> Incoming message: Ill hit you in a lil
>
> Outgoing message: Ok

(Attachment 1, Affidavit, Page 4, G).

The affiant interprets this as a drug deal, claiming that drug dealers often substitute drug terms for benign words to try to camouflage the conversation, so that the word "nails" refers to drugs.

The last outgoing message from the seized phone was on November 24, 2022, stating "I got 100," to which there was no response.  Twenty-six minutes later, there was a 55-second phone call between the two phones. (Attachment 1, Affidavit, Page 5, G).

The affidavit further states that the affiant received information from the CRT/KVET investigator that on November 23, 2022, a confidential informant advised CRT/KV that he could purchase oxycodone pills from a "known drug dealer."  (Attachment 1, Affidavit, Page 5, I).  The affidavit does not disclose the name of the CI and says nothing about the CI's reliability or veracity.  The identity of the drug dealer is also not disclosed. The affidavit states that Investigator Boglitsch met with the CI, searched him, finding no contraband, and provided him funds to buy pills.  (Attachment 1, Affidavit, Page 5, I1). The CI contacted a "known drug dealer" by phone; the drug dealer said they were out of

4

drugs and needed to go get them.  (Attachment 1, Affidavit, Page 6, G2).  He was surveilled to XXXX W. Michigan Ave, Matterhorn Townhomes.  *Id*.  The drug dealer entered apartment 10 and upon exiting went directly to a predetermined location where he met with the CI and delivered oxycodone pills to the CI.  *Id*. The CI was under surveillance until he turned the pills over to Investigator Boglitsch. *Id*.  Even though nobody saw what the drug dealer did inside the apartment, and there is no allegation that drugs were ever sold or observed in the apartment, the affiant claims that the drug dealer obtained drugs inside the apartment from Mr. Jackson.

Further, the officer surveilled apartment 10 for an unspecified duration and observed an unidentified individual exit the apartment several times and walk out to a parking lot out of the officers' view and return shortly.  (Attachment 1, Affidavit, Page 6, K).  Even though it is not known who the individual was or what he did in the parking lot, the affiant claims that this indicates that Mr. Jackson was dealing drugs from apartment 10.

A search warrant was issued and apartment 10 was searched.  Officers found fentanyl. Mr. Jackson made some admissions.  He was charged with possession with intent to distribute fentanyl.  He now brings this motion to suppress evidence found in his residence, as well as all evidence that is product of the poisonous tree, including the statements Mr. Jackson made to the officers.

Additionally, during the execution of the search warrant, police detained Mr. Jackson.  They also seized Mr. Jackson's cellular phone under the search warrant.  While the search warrant authorized the search of the apartment, and the seizure of Mr. Jackson's cellular phone, the search warrant did not extend to the contents of the cellular phone.

5

Nonetheless, police opened Mr. Jackson's cellphone and accessed the contents before obtaining a valid search warrant for the phone itself.

## ARGUMENT

### I.      The affidavit does not establish probable cause.

Under the Fourth Amendment, a search warrant may be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the . . . things to be seized." U.S. Const. Amend. IV.  To establish probable cause, an affidavit must demonstrate that "given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317 (1983). "There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *United States v. Van Shutters*, 163 F.3d 331, 365–337 (6th Cir. 1998)).

The connection between the residence and the evidence of criminal activity must be specific and concrete, not "vague" or "generalized." *Id*. at 595.  Whether an affidavit establishes a proper nexus is resolved by examining the totality of the circumstances presented. *Gates*, 462 U.S. at 238, 103 S. Ct. 2317.  A court must limit its "review of the sufficiency of the evidence supporting probable cause . . . to the information presented in the four-corners of the affidavit." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005).

Here, the information in the affidavit is insufficient for the finding of probable cause that evidence of drug trafficking would be found in the residence.  The affidavit basically

6

alleges three types of information; text messages, drug purchase, and apartment surveillance.  In its totality, this information fails to provide probable cause.

First, text messages between a phone believed to belong to S.W. and the phone associated with Mr. Jackson do not support probable cause.  The two parties discuss selling food stamps and obtaining nails, and do not mention any drugs or drug transactions.  There is nothing inherently sinister in these messages.  The affiant, however, starts from the premise that Mr. Jackson sold drugs to Mr. Smith and through that lens interprets the text message to support it.  The text messages discuss selling food stamps, but the affidavit claims that conversation is about drug dealing because people often exchange food stamps for drugs.  However, people also exchange food stamps for money.  Also, outgoing messages ask about nails.  The affiant claims that based on his training and experience they are talking about drugs.  The affiant does not state that the word "nails" is a known code word for drugs. Instead, the affiant claims that "Drug dealers often substitute drug terms for benign words while communicating by phone to try to camouflage the conversation as a drug deal." (Attachment 1, Affidavit, Page 4).  Under the affiant's interpretation, any word or conversation becomes sinister. But without more context pointing to a drug deal, officers cannot claim that the conversation is about a drug deal simply based on his experience.  While an officers' training and experience may be considered in probable cause analysis, it cannot compensate for a link that is missing in the affidavit. "[W]hile an officer's 'training and experience' may be considered in determining probable cause . . . it cannot substitute for the lack of evidentiary nexus in [a] case, prior to the search, between

7

the [place to be searched] and any criminal activity." *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994).

Second, the alleged drug deal between the CI and the individual referred to as the "known drug dealer" does not support probable cause.  The affidavit alleges that the CI stated he could buy drugs from a known drug dealer.  He contacted the drug dealer who said he needs to obtain drugs.  He went to apartment 10, and upon exiting delivered drugs to the CI who turned the drugs over to officers.

The informant's veracity, reliability, and basis of knowledge are all highly relevant for probable cause. *Gates*, 462 U.S. at 230, 103 S. Ct. 2317.  The affidavit does not disclose the identity of the CI and does not attest to the CI's credibility and veracity in any way, nor does it disclose a basis of knowledge.  Further, the CI has not been inside apartment 10 and did not claim that he observed drugs or drug activity there.  The drug dealer was not searched before he entered the residence, and he was not searched upon exiting the residence.  No one observed the drug dealer inside the residence. He was not searched before and after exiting the apartment.  Moreover, the affidavit does not allege that the residence is known for drug activity, that drugs were ever observed in the apartment, or that any drug transaction or any other illegal activity was ever observed there. Mr. Jackson has no prior drug trafficking convictions. No one ever saw Mr. Jackson in possession of drugs or engaging in a drug transaction at the residence or anywhere else.  Thus, the fact that a drug dealer went inside the apartment before delivering drugs fails to support probable cause.

Third, surveillance of the apartment falls short too.  The affidavit states that an unidentified individual exited the apartment "several" times during surveillance, walked to a parking lot out of the view of officers, and returned shortly after.  There is nothing inherently suspicious about this conduct. The individual was wearing a face mask and could not be identified.  The affiant claims that the individual's height, weight, and build is similar to Mr. Jackson's (who is average weight and height), but so are millions of other people.  Moreover, the officers did not observe what the individual did in the parking lot. The affidavit does not specify how many times an individual exited the apartment nor the time span of surveillance.  It is entirely possible that the individual exited the apartment three times during the course of a day.  This allegation is nothing more than a hunch, but probable cause cannot be based on the officer's mere "hunch." *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744 (2002).  The fact that an unidentified individual made "several" (possibly not more than three) short trips to a parking lot (where he might have gone to smoke a cigarette for all we know) does not add anything to the probable cause analysis.

## II.    The *Leon* good-faith exception does not apply.

A lack of probable cause does not end the inquiry into whether suppression is required.  *United States v. Leon* establishes an exception to the exclusionary rule for evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Leon*, 468 U.S. 897, 905 (1984).  Under *Leon*'s good-faith exception, "courts presented with a motion to suppress claiming a lack of probable cause must ask 'whether a reasonably well-trained officer would have known that the

9

search was illegal despite the magistrate's decision.'" *United States v. S.W.*, 874 F.3d 490, 496 (6th Cir. 2018) (quoting *United States v. Hodson*, 543 F.3d 293 (6th Cir. 2008)).

*Leon* details four circumstances in which an officer's reliance would not be reasonable and the good-faith exception would not apply, one of which is when the affidavit is so completely lacking in factual support that an official belief that probable cause exists would be entirely unreasonable. *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996). "A determination of good-faith reliance, like a determination of probable cause, must be bound by the four corners of the affidavit." *United States v. Laughton*, 409 F.3d 744, 751 (6th Cir. 2005). "Although the good-faith standard is less demanding than the standard for probable cause, the affidavit still must draw some plausible connection to the residence." *United States v. Brown*, 828 F.3d 375, 385–86 (6th Cir. 2016). For *Leon* to apply, "the affidavit must contain 'a minimally sufficient nexus between the illegal activity and the place to be searched.'" *Brown*, 828 F.3d at 385 (citing *Carpenter*, 360 F.3d at 596; *United States v. McPhearson*, 469 F.3d 518, 595 (6th Cir. 2006)).

The affidavit in this case was "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Brown*, 828 F.3d at 385 (quoting *Carpenter*, 360 F.3d at 595). The affidavit does not state that the residence is known for drug activity or that drugs were observed in the residence. There is no allegation that Mr. Jackson is a drug dealer or that he has prior convictions involving drug trafficking. The known drug dealer could have gone inside the residence for any number of reasons, unrelated to drug activity, and without more, that is not sufficient. The text messages do not discuss drugs or drug transactions, but sale of food stamps and nails. Without more

10

concrete indication of a drug transaction, the messages are too speculative to contribute to probable cause.  And surveillance which only revealed that an unknown individual exited the apartment several times for a short period of time, out of officers' sight, adds nothing to the probable cause.

For all these reasons, the affidavit in this case was so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable, and the good-faith exception to the exclusionary rule does not apply.

### III.    Police were required to obtain a search warrant for the cell phone before accessing it.

It is well established that police conducting an arrest cannot access cellular phone contents as a search incident to arrest and without a warrant without violating the Fourth Amendment simply because the phone is unlocked.  "[A] warrant is generally required before such a search, even when a cell phone is seized incident to arrest."  *Riley v. California*, 573 U.S. 373, 401 (2014).  As stated above, the affidavit for the search warrant did not establish probable cause to search the apartment.  Thus, the seizure and search of the cell phone must be suppressed.  Even assuming that the government lawfully obtained the cell phone at issue, the government cannot simply open the phone because they have a search warrant authorizing the seizure of the phone.  Police must obtain an independent search warrant to access the phone and its contents.

The warrant requirement for cell phone searches is not a mere formality.  Cases since *Riley* clearly establish that the circumstances under which a police officer can lawfully search a cell phone without a warrant are extremely rare, typically requiring

clearly identifiable exigent circumstances.  For example, in *Dahl v. Kilgore*, 2021 WL 3929226, at *7 (6th Cir. Sept. 2, 2021) the Sixth Circuit refused to apply the "community caretaker" function to the warrantless seizure and search of a cell phone.  Additionally, the Sixth Circuit has excluded evidence obtained through warrantless searches of cell phones in the context of the reduced reasonable expectation of privacy attendant to probation searches in *United States v. Fletcher*, 978 F.3d 1009, 1019 (6th Cir. 2020).  Furthermore, it is equally well established that police cannot conduct a warrantless and illegal search and then simply obtain a warrant to attempt to purge the taint of the initial illegal search.  *United States v. Williams*, 656 F. App'x 751, 755 (6th Cir. 2016).

Here, police opened Mr. Jackson's cell phone and confronted him with contents contained within it without a warrant.  The warrant did not provide sufficient probable cause to issue to seize the cell phone.  Even assuming the search warrant authorized the seizure of the phone, it did not authorize the search of the phone itself by its express terms, a fact police apparently knew since they obtained a search warrant for the phone five days later on December 20, 2022 after the warrantless search already occurred.

### Conclusion

For all of the above reasons, the affidavit failed to establish probable cause and the *Leon* good-faith exception does not apply. The evidence obtained during the search should be suppressed.

Respectfully submitted,

SHARON A. TUREK
Federal Public Defender

Dated:  September 27, 2023

/s/ Sean R. Tilton
SEAN R. TILTON
Assistant Federal Public Defender
50 Louis NW, Suite 300
Grand Rapids, Michigan 49503
(616) 742-7420

JASNA TOSIC
Research & Writing Specialist